1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STELLA CASTILLO, ) | 1:09cv00638 LJO DLB |
| ) | |
| ) | |
| ) | FINDINGS AND RECOMMENDATIONS |
| Plaintiff, ) | REGARDING PLAINTIFF'S |
| ) | SOCIAL SECURITY COMPLAINT |
| v. ) | |
| ) | |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## BACKGROUND

Plaintiff Stella Castillo ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Magistrate Judge for findings and recommendations to the District Court.

## FACTS AND PRIOR PROCEEDINGS[1]

On July 16, 2001, Plaintiff filed an application for DIB. AR 317-19. She alleged disability since August 1, 2000, due to left shoulder impingement syndrome, diabetes and

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

depression.[2]  AR 306, 311, 336.  She was last insured for DIB on June 30, 2004.  AR 332.  After

Plaintiff's application was denied initially and on reconsideration, she requested a hearing before

an Administrative Law Judge ("ALJ").  AR 306-09, 311-14, 315.  On April 8, 2003, ALJ James

E. Ross held a hearing.  AR 722-54.  ALJ Ross denied benefits on May 15, 2003.  AR 14-23,

649-58.  The Appeals Council denied review on October 20, 2003.  AR 8-10, 675-76.

Plaintiff filed a civil action.  On May 9, 2006, the district court remanded the action to the

Commissioner for further administrative proceedings.  AR 659-61.  On June 17, 2006, the

Appeals Council vacated the May 2003 decision and remanded the case to an ALJ.  AR 662-64.

On January 25, 2007, ALJ James P. Berry held a hearing, but did not take testimony.  AR

919-24.  He planned to obtain additional medical expert input.  AR 922-23.

On June 27, 2007, ALJ Berry held a second hearing.  AR 925-66.  ALJ Berry denied

benefits on August 27, 2007.  AR 637-48.  On February 10, 2009, the Appeals Council declined

jurisdiction.  AR 626-31.

Hearing Testimony

ALJ Berry held a hearing on June 27, 2007, in Fresno, California.  AR 925-66.  Plaintiff

appeared with her attorney, Robert Ishikawa.  Jose Chaparro, a vocational expert, also appeared

and testified.  AR 927.

At the time of the hearing, Plaintiff was 60.  She last worked in June 2005 as a senior

coordinator for the city.  It did not work out.  She worked six hours a day, five days a week, for

three or four months.  She supervised delivery of meals and lunch for seniors.  She ensured

enough meals were ordered.  She also counted money and kept records.  It was two hours of

sitting and four hours of standing.  She earned minimum wage.  She stopped working because the

pressure from supervisors was too much.  AR 929-32.

In 2000, Plaintiff worked at Dollar Tree for about a month.  She had a worker's

compensation injury.  AR 932-33.  At one time, she worked for the IRS in data processing and in

---

[2]Depression was identified in the denial of reconsideration dated June 12, 2002, not the initial application.
AR 311.

criminal investigations.  She did taxes and talked to customers on the phone.  It was a sit-down job.  She had to lift and carry files, but no more than 10 pounds.  AR 933-34.

In 1991, she lost her little girl.  At that time, she had a restaurant business and was self-employed.  In the restaurant, Plaintiff worked the front, did payroll, made banquet appointments and supervised waitresses.  It was a full-time job, about seven days a week.  When she lost her daughter, Plaintiff closed and sold the restaurant.  She did not do anything for about a year.  She went back to the IRS, but it did not work out.  She could not remember how to get on and off the computers.  AR 934-35.

Plaintiff injured her left shoulder at Dollar Tree on September 3, 1999.  She still has problems with her left arm.  She can only lift to about head level.  She has pain on the shoulder blade and the rotator.  She can grasp, but drops things.  She has no control from the rotator to the hand.  She cannot lift a gallon of milk with her left hand.  AR 936.  When asked if she could pick up small objects, Plaintiff testified that there is no contact from her wrist to the tip of her fingers on her left hand.  She has no strength to push.  She has a housekeeper to clean.  AR 937.

She has problems pushing and pulling with her left hand.  She has neuropathy and sometimes has a loss of feeling in her left hand.  She wakes up in the morning with numbness.  It lasts a half hour to an hour.  AR 938.  She can lift five pounds with her right hand.  She always has somebody put her groceries in the car.  The heaviest thing she can lift with both hands is a gallon of milk.  She can carry a gallon of milk in her right hand for about 10 feet.  She is right-handed.  AR 939.  She is starting to have problems writing.  AR 939.  It is hard to push a pencil.  She can write about 15, 20 minutes.  She cannot do keyboarding.  She can reach about head level with her right hand, but not all the time or constantly.  AR 940.

Plaintiff testified that her neuropathy is down to her feet.  It started with her hip and now it is at the bottom of her feet.  It is very painful.  She takes three pain pills a day.  Next week, she will be on four pain pills.  She can walk about half a block to a block, but she will rest.  She does not use a cane if she is in her backyard.  If she is going somewhere or to the mailbox, she will use it.  She has been using a cane for over five years.  AR 941.  Her doctor gave it to her.  She was falling a lot.  She does not use it inside the house.  AR 942.

Plaintiff has been seeing "Dr. Seedow" for 23, 24 years.[3]  He's a regular medical doctor and she sees him for everything.  She sees him once a month for her diabetes.  It is hard to keep the diet for her diabetes.  She has really been on it, because he scared her.  She constantly was drinking Pepsis, and he said keep away from it.  She has been without them for about two weeks now.  It is working out and controlling her sugar.  AR 942-43.  She takes medication for her diabetes.  She does not have problems following the medication regimens.  She is on insulin, too. AR 943.

Plaintiff testified that she has problems with her feet.  From her ankle down, they feel like they are broken.  It is the neuropathy, which feels like needles are sticking in her from the bottom of the toes.  It sometimes lasts all day long.  She has good and bad days.  She just stays off her feet, elevates them and takes pain pills.  It started about three or four months ago.  She has had neuropathy for about two years in other places.  AR 944.

Plaintiff tells Dr. Acedo about her depression or mental health.  He knows all her problems.  She has taken Prozac for her mental health.  He told her the other day, that if she had to, then go back on it.  She is losing her husband.  He's dying.  He has had several massive heart attacks and his heart is only working 26 percent.  It is very hard for her.  She has been taking sleeping pills for about three weeks.  She cannot sleep and is under a lot of pressure with him. AR 944.  He won't accept a caregiver and does not want anybody but her.  AR 945.  It brings back memories.  She lost her 10-year-old.  About six years ago, she lost her grandson at 19.  He was run over.  She lost his mother, her adopted daughter, two years later.  Now she is losing her husband.  She does not know how she is living.  She told Dr. Acedo that she doesn't know why all this happens to her.  AR 945.

Plaintiff testified that she has been depressed since she lost her daughter.  She has problems concentrating and her memory is getting worse.  She can concentrate on something for about an hour.  She writes everything down now.  If not, she doesn't remember.  It's embarrassing.  She does not socialize like she used to and isolates herself a lot.  She will read, do puzzles or watch TV.  AR 946.

---

[3]"Dr. Seedow" appears to be a phonetic spelling for "Dr. Acedo" made by the transcriber.

Plaintiff testified that when she worked with the senior citizens she had a problem with a manager. She was good with the seniors. She felt she could still do something for somebody. Now when she knows she cannot do it, it's sad. It has been 17 years since she lost her little girl, then to lose an adopted daughter or a grandson and now her husband. AR 947. She sits and cries by herself all the time. She does not do it in front of her husband because she doesn't want to upset him. AR 947. Her symptoms have been like this since she lost her little girl. She always has had them. She went through a lot of psychiatrists, but they don't tell you anything. It's hard to get up. She doesn't sleep with her husband anymore. She is afraid to open the door and see if he's still alive. AR 948.

Plaintiff testified that she can stand 15 minutes with her cane. She thought she could stand about an hour in a whole day. She is sitting most of the day. She will nap when she is real depressed. Her depression pills put her to sleep and she will take a four-hour nap with no problem. She is doing that about twice a week now. The Prozac and the sleeping pills "do not get along." AR 949. She is trying to hold off on the Prozac. AR 949.

Plaintiff lives in a house with her husband. She has a driver's license and drives when she can. She shops for groceries. She does not cook every day. She is not taking Prozac or seeing a psychiatrist or psychologist. AR 950-51.

Her medications are helpful, except for the one that she takes for depression. She is not in her right mind. She feels like a zombie. She has not had any side effects from her medications. She did not think she could sit for six hours a day. She will sit for half an hour, 45 minutes, then she will get up and walk around a little bit. She thought she would be able to sit two or three hours a day. AR 952.

The Vocational Expert ("VE") also testified. He was not clear on Plaintiff's job at the IRS. Plaintiff testified that she did data processing and criminal investigation. AR 953. She would prepare files for the agents. She moved around a lot, going up on her grades. She was six months at one job, nine months at another job. She would apply for certain jobs and her evaluation was very good. When she went back, she just hit bottom. In the last job, she was in

collections.  She would call the customer and explain penalties and interest.  She sometimes wrote letters.  AR 954-55.

The VE testified that Plaintiff's job with seniors and supervising delivery of meals appeared to be a limited range of duties, called a case aide, which is light work, semiskilled.  The Dollar Tree job is cashier II, which is light work, unskilled.  The IRS data transcriber job, a data entry clerk, is sedentary and semiskilled.  Her work as a labor union business representative is defined by the DOT as sedentary and skilled.  Her job as a companion is light and semiskilled.  Her job as a collector is light work, semiskilled.  AR 957-58.

Plaintiff acquired skills in her past jobs.  For example, the skills included taking care of people like accommodating, clerical skills like operating a ten key, computer or other office machines, mediating, negotiating, maintaining records, dealing with people tactfully, especially difficult people.  The VE testified that the case aide and the companion skills would be industry specific.  The data entry clerk could transfer to other similar clerical occupations.  The collector also could be transferred to similar occupations, like telephone solicitor.  AR 958.  The clerk skills would transfer to data examination clerk, which is sedentary and semiskilled.  There are about 2,800 jobs in California and about 21,000 nationally.  The telephone solicitor is sedentary and semiskilled, with 25,000 jobs in California and about 310,000 nationally.  AR 959.

For the first hypothetical, the ALJ asked the VE to assume an individual 60 years of age with some college course credits and Plaintiff's past relevant work experience.  This individual has a combination of severe impairments and retains the residual functional capacity to lift and carry 20 pounds occasionally, 10 pounds frequently.  This individual could stand, walk and sit six hours each.  This individual could not perform overhead work or repetitively forceful push, pull or grasp with the non-dominant left upper extremity.  The VE testified that this individual could perform all of Plaintiff's past relevant work.  AR 960-61.

For the second hypothetical, the ALJ asked the VE to assume an individual with the same vocational parameters with a combination of severe impairments.  This individual retained the residual functional capacity to lift and carry 10 pounds occasionally and frequently.  This individual could stand, walk and sit six hours.  This individual could occasionally climb ramps

and stairs and occasionally reach above shoulder level with the non-dominant left upper extremity. This individual occasionally could handle, but could not climb ropes, ladders or scaffolds and could not kneel, crouch or crawl. AR 961. The VE testified that this individual was precluded from doing all past relevant work, but could perform other jobs that existed in the national economy. For example, there is children's attendant, which is light and unskilled, with 800 jobs in California and 7,000 nationally. There also is usher, which is light and unskilled, with 800 jobs in California and 7,000 nationally. AR 962.

For the third hypothetical, the ALJ asked the VE to assume an individual with the same vocational parameters. This individual had a combination of severe impairments and retained the residual functional capacity to stand one hour maximum, walk up to one block, lift and carry approximately a gallon or eight pounds, and sit two to three hours. This individual would need to use a cane for balance with walking. This individual could not use a keyboard and type or repetitive grip or grasp. This individual had difficulty maintaining concentration and had difficulty with memory. AR 962. With these limitations, the VE testified that the individual could not perform any of Plaintiff's past work or any other jobs in the national economy. AR 963.

In response to questions from Plaintiff's attorney, the VE testified that in the usher job required occasional handling of tickets and programs. AR 963-64.

Plaintiff's attorney asked the VE to use the second hypothetical and add that the person would have marked difficulty in maintaining concentration, persistence and pace and marked difficulties in maintaining social functioning. The VE testified that this person would be precluded from doing any past relevant work or any other work. AR 964.

Medical Record[4]

On February 20, 2001, Plaintiff reported to Penny Brown, R.N., in the Diabetes Care Management Program at Kaiser Permanente, that she does not have time to eat three meals a day. Plaintiff said she was active but got no actual exercise because she was too busy. Plaintiff did

---

[4]Plaintiff's claims relate to her mental impairment and therefore only pertinent portions of the medical record will be summarized.

not want to take insulin because her first husband took it and she "saw what it did to him."  AR 485.

On March 20, 2001, Plaintiff saw Nurse Brown for her diabetes care.  Plaintiff reportedly was adamant that she did not want to take insulin.  Her medical problem list included diabetes mellitus Type 2, obesity and DJD.  AR 477.

On April 23, 2001, Plaintiff saw Nurse Brown and said she was walking 4 days/week for 20 minutes.  She had burning on the bottom of her feet.  Plaintiff was "[r]eluctant to go on insulin because of problems ex-husband had with erratic BG when on insulin."  AR 465.

On May 2, 2001, Plaintiff met with Nurse Brown.  Plaintiff reported that she was walking, but had some foot pain/burning.  Nurse Brown recommended that Plaintiff continue to improve her diet, continue walking and continue her medications.  Plaintiff's blood sugars had improved, but were still high.  AR 460.

On January 7, 2002, Plaintiff contacted the state agency analyst regarding her "psych allegation."  Plaintiff stated that she did not feel there were "significant enough limitations currently in adls on a mental basis to warrant consideration of psych issues in her claim."  AR 359.  Plaintiff identified that her limiting condition was her arm and indicated that "although she suffers some depression . . . it is not at the intensity or severity to restrict work on a mental basis."  AR 359.

On June 10, 2002, Murray Mitts, M.D., a state agency medical consultant, completed a Psychiatric Review Technique form.  He opined that Plaintiff's depression was not severe.  AR 592, 595.  State agency medical consultant Glenn Ikawa, M.D., also signed the form on June 12, 2002.  AR 592.

On April 16, 2003, Dr. Acedo wrote to Plaintiff's counsel.  Dr. Acedo described Plaintiff as evolving from a "rather major affective disorder, into a variety [of] arthropathies."  AR 623.  Plaintiff had been unable to maintain any type of ongoing employment, and he had come to the realization that she would probably never be able to enter the work force.  Her hyperglycemia was essentially out of control.  He felt she had given up on her own life since she lost her child and was on a slow, passive, self-destructive decline.  Dr. Acedo opined that diabetes was her

8

worst health issue, but her altered self image, her poor self esteem was leading to her demise. She had a difficult time maintaining interpersonal relationships, tending to distance herself from those who tried to help her.  AR 623.

On July 8, 2004, Plaintiff reported an episode while driving where everything was blurry and she only could see outlines.  A driver followed her and told her that she ran a red light. Plaintiff called her daughter to pick her up.  Plaintiff had not been taking her insulin.  She admitted attending several gatherings and eating a lot.  She claimed that she did not know what she should eat.  Nurse Brown noted that Plaintiff previously had been given written materials and told which foods contain carbohydrates and how many she should be eating per meal.  AR 861.

On October 12, 2005, Plaintiff had a rise in her glucose levels.  She was not following her diet.  She was advised to increase her insulin.  AR 801.

On June 1, 2006, Plaintiff was referred to Jennifer I. Bague, M.S.  Plaintiff reported that she was experiencing stress because her husband was very ill.  Plaintiff did not want to book a "BMS visit."  AR 787.

On July 28, 2006, Plaintiff saw Dr. Acedo for follow-up on "her disability status."  AR 784.  Dr. Acedo made notations regarding a prior ALJ decision, indicating that his comments "(the MD who knows her best), has seen her the longest, were given 'less weight.'"  AR 785.  He reported that a on review of her chart, she was seeing psychiatry at the time and "was on medication for depression and anxiety, given by Psychiatry."  AR 785.

Dr. Acedo also noted that Plaintiff's glucose had been high and she had just returned from Idaho-Montana.  While there, she admitted being off her diet, having diet pops and having coolers made with ice cream.  It was "no wonder" her glucose was elevated as she was noncompliant with her diabetes diet.  AR 785.  Dr. Acedo reported that despite all the conversations regarding her diet, Plaintiff "still tries to seek the easy way out, or discounts the [diabetes mellitus] diet."  AR 785.

On objective review, Plaintiff was sitting in the exam room, smiling, pleasant and interactive, "hoping to get a refill of diet suppressant agents."  Dr. Acedo indicated that time was spent on her eating habits, and "the need for her to re-present herself to the ALJ for disability

purposes." AR 785.  Dr. Acedo identified that Plaintiff was under stress of her spouse's "delicate physical health," was still dealing with the demise of her daughter, and was "living in some psychological alternative universe." AR 785.  Dr. Acedo opined that Plaintiff had real problems and her whole persona was "based on her self image, that of poor self image and depression since her child died and the near expectation that she is entitled to disability due to the burden of depression-grief, and the ravages of her diabetes." AR 785.  Dr. Acedo stated that he did not "see her employable then, and see her as even LESS employable now." AR 785.  He wondered "how much of her demeanor is due to an unspoken death wish." AR 785.

On July 31, 2006, following a referral from Dr. Acedo, Plaintiff saw Janet A. Flanagan, LCSW, for stress and to get information about her past mental health visits for social security. Ms. Flanagan noted that Plaintiff had a history with mental health from 1995-1998.  AR 783-84. On current mental status evaluation, Plaintiff was normal with the exception of an impairment of her long-term memory.  Ms. Flanagan indicated that Plaintiff had chronic pain syndrome, stress and psychological factors affecting her medical condition.  AR 784.

On September 16, 2006, Plaintiff saw Dr. Acedo and reported knee pain.  She spent the "bulk of her [appointment] describing the stress she is under with her spouse, and how they are driving each other apart." AR 782.

On October 31, 2006, Plaintiff reported to Dr. Acedo that she had knee pains.  He noted that he was "still trying to get he[r] on the same page for understanding glucose toxicity - but she either does't [sic] want to see, or chosses [sic] NOT to see." AR 781.

On December 8, 2006, Plaintiff saw Dr. Acedo for hemorrhoids.  Dr. Acedo indicated that Plaintiff looked depressed with a constricted mood.  Plaintiff reported being "despondent with her spouse." AR 781.

On December 16, 2006, Dr. Acedo completed a Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment form.[5]  Dr. Acedo opined that Plaintiff was moderately limited in the ability to understand, remember and carry out detailed instructions.  She was moderately to markedly limited in the ability to maintain attention and

---

[5]Taken from the Social Security Disability Advocate's Handbook.  AR 900-902.

10

concentration for extended periods.  She also was moderately limited in the ability to perform

activities within a schedule, maintain regular attendance and be punctual within customary

tolerances, sustain an ordinary routine without special supervision, work in coordination with or

proximity to others without being unduly distracted by them and make simple work-related

decisions.  Dr. Acedo further opined the Plaintiff was markedly limited in the ability to complete

a normal workday and workweek without interruptions from psychologically based symptoms

and to perform at a consistent pace without an unreasonable number and length of rest periods.

AR 901.  She was moderately limited in the ability to accept instructions and to respond

appropriately to criticism from supervisors.  AR 901.  She was mildly to moderately limited in

the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness

and cleanliness.  AR 902.  She was moderately limited in the ability to respond appropriately to

changes in the work setting, be aware of normal hazards and take appropriate precautions, travel

in unfamiliar places or to use public transportation, and set realistic goals or make plans

independently of others.  AR 902.  Dr. Acedo indicated that the limitations had lasted 12

continuous months or could be expected to last 12 continuous months at the assessed severity.

AR 902.  He reported that a "cursory review" of his records showed that Plaintiff's limitations

had existed since 1997-98.  AR 902.

In a letter, Dr. Acedo further opined that Plaintiff had been a problematic patient from the

outset, with depression, dysthymia, stress and an inability to see or perceive the health risks from

her diabetes.  She was "self-absorbed" and had never been in good control of her diabetes.  Dr.

Acedo further opined that Plaintiff's psychological state was constantly in flux, she was most

comfortable in a despondent mode and her brighter periods only bring her "later anguish."  AR

908.  Dr. Acedo did not understand how she functioned in the work force to begin with and he

did not see her ever rejoining the work force.  He had rarely seen a patient who needed

uncommon support like Plaintiff.  He did not think she liked herself very much.  AR 908.

On February 26, 2007, Herb Tanenhous, M.D., submitted responses to the ALJ's

interrogatories.  Dr. Tanenhous gave weight to Dr. Acedo's notes and letters.  He opined that

Plaintiff could be rated under Affective Disorders and Personality Disorders.  She had a mood

disturbance, a Major Depression, Chronic, with evidence of a loss of interest in almost all activities, psychomotor disturbance, decreased energy and feelings of guilt or worthlessness. Dr. Tanenhaus indicated that her mental status has resulted in marked difficulties in maintaining social functioning and marked difficulties in maintaining concentration, persistence and pace. AR 909. Her marked impairment in the ability to follow complex instructions was manifested by her inability to follow medical and dietary guidelines about the management of her diabetes. AR 910. Her marked impairments had been operating for more than the past twelve months. Dr. Tanenhaus "did not find evidence of an onset date different from 6-30-04." AR 910. He opined that Plaintiff's multiple fractures, osteoporosis and chronic pain contributed to the impairment of her ability to maintain an adequate pace and produce the necessary work to maintain employment. AR 911. Dr. Tanenhaus concluded that her condition was chronic, would be expected to last for at least twelve months and the progression of her diabetes would worsen her prognosis. AR 911.

ALJ's Findings

The ALJ found that Plaintiff last met the insured status requirements on June 30, 2004. AR 642. She did not engage in substantial gainful activity during the period from her alleged onset date of August 1, 2000, through her date last insured. She had the severe impairments of diabetes mellitus and bilateral shoulder adhesive capsulitis. AR 642. Through the date last insured, she retained the residual functional capacity ("RFC") to perform a wide range of light work, which precluded lifting and carrying more than 20 pounds occasionally or 10 pounds frequently, standing, walking or sitting for more than about six hours of an eight-hour workday; and all use of the non-dominant left upper extremity for overhead work, forceful grasping or forceful and repetitive pushing or pulling activity. AR 645. She remained capable of performing her past relevant work as a case aide, companion, cashier II, data entry clerk, collector and labor union business representative. AR 647-48.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations,

the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. 405(g). Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *See, e.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

### REVIEW

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). A claimant must show that she has a physical or mental impairment of such severity that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. § 404.1520(a)-(g). Applying the process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity between the alleged onset of her disability and her date last insured; (2) has an impairment or a combination of impairments that is considered "severe"

(diabetes mellitus and bilateral shoulder adhesive capsulitis) based on the requirements in the Regulations (20 C.F.R. § 404.1520(c)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; and (4) can perform her past relevant work. AR 642-48.

Here, Plaintiff argues that the ALJ (1) failed to properly evaluate her depression as severe at step two of the sequential evaluation process; and (2) failed to properly assess the physician opinion testimony.

## DISCUSSION

A.    Evaluation of Mental Impairment at Step Two

Plaintiff argues that the ALJ improperly found her depression nonsevere at step two of the sequential evaluation process.  At step two, the ALJ determines whether a claimant has a severe impairment of combination of impairments.  A severe impairment is one that significantly limits the claimant's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c). An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at this step when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work, even if the individual's age, education, or work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities).  SSR 85-28.

Here, the ALJ analyzed the degree of Plaintiff's functional limitations in activities of daily living, maintaining social functioning, maintaining concentration, persistence or pace, and episodes of decompensation as part of his step two and three findings.  A mental impairment generally is considered not severe if the degree of limitation in the three functional areas of activities of daily living, social functioning, and concentration, persistence or pace is rated as "none" or "mild" and there have been no episodes of decompensation.  20 C.F.R. § 404.1520a(d)(1).  The ALJ found that Plaintiff had no restriction of activities of daily living, mild difficulties in maintaining social functioning and mild difficulties in maintaining

concentration, persistence or pace.  He also found that Plaintiff had not exhibited repeated

episodes of decompensation, each of extended duration.  AR 644.

In reaching these findings, the ALJ cited Plaintiff's own admission in January 2002 that

she did not feel there were significant enough limitations in her activities of daily living from

mental issues to warrant consideration of any psychiatric issues in her disability claim.  Plaintiff

identified her primary limitation as her arm impairment.  AR 643.  The ALJ also pointed to

Plaintiff's additional admission that although she suffered some depression it was not at the

intensity or severity to restrict work.  AR 643-44.  As corroboration, the ALJ cited Plaintiff's

testimony that she was not taking psychotropic medication or receiving mental health treatment.

He further noted that her testimony reflected a wide variety of activities of daily living, including

providing care for her husband and traveling to Idaho and Montana.  AR 644.

In challenging the ALJ's findings, Plaintiff first argues that the ALJ erred because Dr.

Acedo "documented the history of plaintiff's 'major affective disorder' in Kaiser Permanente

medical records."  Opening Brief, p. 5.  Plaintiff's citation to a large portion of the Kaiser

Permanente medical records (AR 415-568, 611-622, 781-882, 883-899) is unpersuasive.  The

bulk these records are irrelevant to Plaintiff's claim of a major affective disorder and include

Plaintiff's gynecology, optometry, orthopaedic, worker's compensation, x-ray and physical

therapy records.  The few records that are relevant do not support Plaintiff's argument.  For

instance, in a single treatment record from 2003, Dr. Acedo opined that Plaintiff "looks much

more moody/unstable," but he made no other findings or diagnoses regarding her mental

condition.  AR 872.  In 2006, a clinical social worker identified that Plaintiff had a history with

mental health from 1995-98, but this was prior to Plaintiff's alleged onset date.  AR 783-84.

Other cited records document "stress" or depression that Plaintiff was experiencing with her

husband after her date last insured.  AR 782-85, 787, 816, 818, 825-26.  In sum, the cited records

do not reflect that Plaintiff received mental health treatment or complained of depression during

the relevant time period.  Therefore, they are not substantial evidence establishing a "documented

history" of a mental impairment.  *See, e.g., Ukolov v. Barnhart*, 420 F.3d 1002, 1005 (9th Cir.

2005) (noting that the existence of a medically determinable physical or mental impairment may only be established with objective medical findings) (citing SSR 96-4p).

As discussed more fully below, Dr. Acedo's April 2003 letter and December 6, 2006, medical source statement do not change this result.  In April 2003, Dr. Acedo opined that Plaintiff had "evolved from a rather major affective disorder, into a variety [of] arthropathies." AR 623.  In December 2006, Dr. Acedo identified marked and moderate limitations in Plaintiff's mental functioning which, based on a "cursory review" of his records, were ongoing since 1997-98.  AR 900-02.  Dr. Acedo also reported that Plaintiff had been "problematic" from the outset, with "depression-dysthymia-stress."  AR 908.  Despite Dr. Acedo's statements, there is very little in the record to support any mental health treatment, clinical findings or diagnoses during the relevant time period.  An ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings. _Thomas v. Barnhart_, 278 F.3d 947, 957 (9th Cir. 2002); _Magallenes v. Bowen_, 881 F.2d 747, 751 (9th Cir. 1989) (a brief and conclusionary form opinion which lacks supporting clinical findings is a legitimate reason to reject a treating physician's conclusion); _see also Lingenfelter v. Astrue_, 504 F.3d 1028, 1038 n. 10 (9th Cir. 2007) (treating physician's opinion must be given controlling weight only if it is well-supported and not inconsistent with the other substantial evidence in the record).

Plaintiff also relies on the findings of Dr. Tanenhaus, the non-examining medical expert, who determined that Plaintiff had chronic major depression.  AR 909.  However, Dr. Tanenhaus clearly relied on Dr. Acedo's opinion, stating that "[w]eight was given to the notes and letters submitted by . . . Randolph Acero, MD."  AR 909.  However, Dr. Acero's opinion was unsupported.  To the extent that the ALJ properly rejected Dr. Acedo's opinion, the ALJ could properly give less weight to the non-examining, non-treating physician.  _Andrews v. Shalala_, 53 F.3d 1035, 1040-41 (9th Cir. 1995) (non-examining source opinion given less weight than opinion of treating and examining physicians).  Further, Dr. Tanenhaus admitted that he did not have a recent assessment of Plaintiff's activities of daily living or evidence of her having decompensated in work or work-like settings.  AR 909-10.  Of interest, when responding to the

question of whether Plaintiff's mental impairment was present prior to June 30, 2004, Dr. Tanenhaus stated that he "did not find evidence of an onset date different from 6-30-04." AR 910. This is Plaintiff's date last insured.

Plaintiff further argues that the ALJ incorrectly interpreted the record evidence to conclude that Dr. Acedo's opinion at step two was inconsistent with the record. AR 644. As noted, the ALJ first pointed to Plaintiff's admission in a report of contact that her depression did not significantly limit her activities of daily living or her ability to perform work related tasks. AR 644, 359. Although Plaintiff argues that the report of contact is multiple hearsay, it is no more problematic than treatment records reflecting Plaintiff's statements to her physicians or her telephone contacts with doctors or nurses.

The ALJ next pointed to Plaintiff's testimony that she was not taking psychotropic medication. AR 644. Plaintiff argues that the ALJ erred because her medication list includes Prozac. While the record does reflect that Plaintiff was prescribed Prozac in August 2003, the record also reflects that it was dispensed only once and no refills were given. AR 756. There is no indication that she used the medication, that she ever requested a refill or that she was currently taking the medication. AR 756. Plaintiff contends that her testimony "can most reasonably be interpreted to mean that she is currently on medication for her depression, but that she did not take it prior to the hearing because she did not want to 'feel like a zombie' and she wanted to remain alert for the hearing." Motion, p. 14. However, at the hearing, Plaintiff testified that she was "trying to hold off . . . on the Prozacs especially" and she did not "want to go back [to] them." AR 949. When asked, "Are you taking it now?," Plaintiff responded "not right now." AR 951. An ALJ may draw inferences logically flowing from the evidence. *See* *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).

The ALJ also pointed to Plaintiff's admission that "she has not received any mental health treatment." AR 644. Plaintiff claims that the ALJ's determination is incorrect because when asked if she was getting any mental-health related treatment, Plaintiff responded that she was told "just last week . . . to go back with the one up at Kaiser." AR 951. Plaintiff correctly notes that this is not an admission that she has *never* received mental health treatment. However,

it is an admission that she currently was not receiving mental-health treatment.  Indeed, at least one treatment record reflects that she received mental-health treatment from 1995-1998, but this concluded prior to her alleged onset date.  AR 783-84.  Accordingly, the ALJ did not err in the determination that Plaintiff had not received mental health treatment from her alleged onset date "[t]hrough the date last insured."  AR 642, 644.

The ALJ also pointed to Plaintiff's testimony that she engages in a "wide variety of activities of daily living. She provides care for her husband. She and her husband were capable of traveling on vacation to Idaho and Montana."  AR 644.  Plaintiff argues that the ALJ mischaracterized her testimony.  As to providing care for her husband, Plaintiff testified that he "won't accept caregiver. He doesn't want nobody in there but me."  AR 945.  Given this testimony, the ALJ was entitled to an inference that Plaintiff acts as her husband's caregiver.

As to traveling to Idaho and Montana, the record reflects that in July 2006, Plaintiff had "just returned from Idaho-Montana, where she took her spouse to see his brother."  AR 785.  Plaintiff disputes the ALJ's identification of this trip as a "vacation," arguing, among other things, that there is no mention of vacation or vacation related activities in the record.  Opening Brief, p.11.  Regardless of the description, the record reflects that Plaintiff was capable of traveling to Idaho-Montana, taking her spouse with her, going off her diabetes diet and eating "coolers" made of ice cream.  AR 644.  There is no indication that the ALJ made a material error in his characterization of the evidence.

Accordingly, the ALJ's findings at step two were supported by substantial evidence and free of legal error.   Moreover, Plaintiff prevailed at step two based on her diabetes mellitus and bilateral shoulder capsulitis.  AR 642.  Once a plaintiff prevails at step two, regardless of which condition is found to be severe, the Commissioner proceeds with the sequential evaluation, considering at each step all other alleged impairments and symptoms that may impact her ability to work.  42 U.S.C. § 423(d)(2)(B).  Even though the ALJ found Plaintiff's mental impairment to be non-severe, he analyzed the impairment's effects on residual functional capacity at a subsequent step.  20 C.F.R. § 404.1545(a)(2); *see also* Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007).  Specifically, the ALJ addressed the extent of Plaintiff's limitations from her mental

impairment in his step four analysis.  AR 647.  Therefore, the Court finds that, even if the ALJ committed error at step two by not concluding that Plaintiff's mental impairment was severe, it was harmless and does not necessitate remand.

B.      Step Four - Physician Opinions

Plaintiff argues that the ALJ erred at step four by rejecting the mental residual functional capacity assessment of her treating physician, Dr. Acedo.  The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant.  *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.1998); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995).  Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record.  *Lester*, 81 F.3d at 830.  Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record.  *Id.* (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983)).  This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.  *Magallanes*, 881 F.2d at 751.  The ALJ must do more than offer his conclusions.  He must set forth his own interpretations and explain why they, rather than the doctors', are correct.  *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir.1988).  Therefore, a treating physician's opinion must be given controlling weight if it is well-supported and not inconsistent with the other substantial evidence in the record.  *Lingenfelter*, 504 F.3d at 1038 n. 10.

Plaintiff asserts that the ALJ did not provide clear and convincing reasons to reject the uncontradicted opinion of her treating physician, Dr. Acedo.  As an initial matter, Dr. Acedo's opinion was contradicted by the state agency medical consultants who determined that Plaintiff's mental impairment was not severe.  AR 592.  Therefore, the ALJ was required to provide "specific and legitimate" reasons supported by substantial evidence in the record.  *Lester*, 81 F.3d at 830.

Here, the ALJ gave no evidentiary weight to Dr. Acedo's statements at step four, reasoning:

> Dr. Acedo's statements and opinions generally reflect that the claimant is unable to function in a workplace setting . . . . However, Dr. Acedo's opinions are inconsistent with the level of activities of daily living the claimant engages in.  In 2005, the claimant was able to perform work activity at the substantial gainful activity level for four months.  The claimant told her medical care providers that she was too busy and active to take insulin or to eat three meals a day as she was instructed.  For the reasons above, I find Dr. Acedo's opinions and statements are not reflective of the claimant's mental and physical capabilities.

AR 646-47.  As with the ALJ's determination at step two, Plaintiff argues that the ALJ mischaracterized the record and his decision was not supported by substantial evidence.

First, with regard to activities of daily living, Plaintiff testified that she provides care for husband, she drives, shops for groceries, cooks, reads, does puzzles and watches TV.  AR 945-46, 950-51.  The third-party questionnaire from Plaintiff's husband, Stephen F. Clubb, corroborates this testimony and admits that Plaintiff is able to drive, shop, put together puzzles, go to church each week, visit with family and watch television.  AR 354-56.  Plaintiff also admitted that there were not significant limitations in her activities of daily living on a mental basis.  AR 359.  The ability to perform certain daily activities may serve as evidence of ability to work.  *See, e.g., Morgan v. Comm'r*, 169 F.3d 595, 600 (9th Cir. 1999) (ability to fix meals, do laundry, work in the yard, and occasionally care for friend's child served as evidence of ability to work).  Moreover, in deciding whether to grant a treating physician's opinion controlling weight, the ALJ may take into account its consistency with the record.  20 C.F.R. § 404.1527(d).

Second, with regard to the ALJ's determination that Plaintiff worked four months in 2005, this is an accurate characterization of Plaintiff's testimony.  AR 929-32.  Plaintiff argues that this was a "trial work period" and should not be used to support a conclusion that she is not disabled.  A "trial work period" is relevant to claimants who, unlike Plaintiff, have been determined disabled.  42 U.S.C. § 422(c)(1), (3) ("period of trial work . . . shall begin with the month in which he becomes entitled to disability insurance benefits").  Moreover, the record reflects that Plaintiff ceased working because of "a problem . . . with the jealously [sic] there with . . . a manager," and not because of depression or other mental impairment.  AR 929-32, 947.

Third, with regard to the ALJ's determination that she was too busy and active to take insulin or to eat three meals a day, Plaintiff argues that this evidence is "insufficient to lead one

to a conclusion that [she] is so active and busy that her conduct is inconsistent with the opinions of the physicians." Opening Brief, p. 12. However, in a July 2006 treatment record, Dr. Acedo opined that Plaintiff's non-compliance with her diabetes treatment was linked to her poor self image and depression since the death of her child. He also speculated that her continued hyperglycemia might be "due to an unspoken death wish." AR 785. Given this opinion, the ALJ's observation of conflicting clinical records demonstrating that Plaintiff failed to comply with diabetes treatment for reasons unrelated to depression or to a mental impairment was appropriate. AR 465; *Magallanes*, 881 F.2d at 751 (lack of supporting clinical findings is a valid reason for rejecting a treating physician's opinion). Further, a social worker who assessed Plaintiff three days after Dr. Acedo rendered his opinion found that Plaintiff had normal mental status with the exception of a long-term memory impairment. She was not assessed with depression or poor self-image. AR 784.

The Court finds that Dr. Acero's opinion is unsupported by treatment records, clinical findings or Plaintiff's own admissions. The Court is mindful of the decision in *Orn v. Astrue*, 495 F.3d 625 (9th Cir. 2007), where the Ninth Circuit reiterated its position regarding the opinion of a treating physician. However, where the treating physician's opinion is not supported in the first instance, as here, *Orn v. Astrue* is not instructive.

Plaintiff also claims that the ALJ failed to offer clear and convincing reasons to reject the opinion of Dr. Tannenhaus, a non-treating, non-examining physician. As with Dr. Acedo, his opinion was contradicted by the state agency medical consultants and the ALJ was required to provide "specific and legitimate" reasons supported by substantial evidence in the record to reject it. *Lester*, 81 F.3d at 830. The ALJ here gave "little evidentiary weight" to Dr. Tanenhaus' opinion. In so doing, the ALJ stated:

> The psychiatric medical expert opined that the claimant met the listing criteria for medical listing section 12.04 in the Listing of Impairments, 20 CFR Part 404, Subpart P, Appendix 1. However, [she] engages in a wide variety fo activities that are inconsistent with the opinion of this medical expert. The claimant provides care for her husband. She worked for three months in 2005. She engages in a variety of activities of daily living. She admitted that she went on a vacation to Idaho and Montana in 2006. Therefore, I find the psychiatric medical expert's opinion is grossly inconsisten with the record as a whole. . . .

AR 647.  These reasons are nearly identical to those offered to reject Dr. Acedo's opinion, and the Court correspondingly finds that they are specific and legitimate reasons to reject Dr. Tannehaus' opinion.

## **RECOMMENDATION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence and is based on proper legal standards.  Accordingly, the Court RECOMMENDS that Plaintiff's appeal from the administrative decision of the Commissioner of Social Security be DENIED and that JUDGMENT be entered for Defendant Michael J. Astrue and against Plaintiff Stella Castillo.

These findings and recommendations will be submitted to the Honorable Lawrence J. O'Neill pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within thirty (30) days after being served with these findings and recommendations, the parties may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:    **July 13, 2010**              **/s/ Dennis L. Beck**

                                    UNITED STATES MAGISTRATE JUDGE